```
UNITED STATES DISTRICT COURT
     DISTRICT OF CONNECTICUT
```

```
-------------------------------x
WILLIE NELSON, FRANK GAMBLE,   :
STEVENSON DICKERSON, and       :
KENNETH MCLEOD,                :
                               :
          Plaintiffs,          :
v.                             :   Civ No. 3:07CV344(AWT)
                               :
YALE UNIVERSITY and LOCAL 35,  :
FEDERATION OF HOSPITAL AND     :
UNIVERSITY EMPLOYEES,          :
                               :
          Defendants.          :
-------------------------------x
```

## RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs Willie Nelson ("Nelson"), Frank Gamble ("Gamble"), Stevenson Dickerson ("Dickerson"), and Kenneth McCleod ("McCleod") bring this action against Yale University ("Yale") and Local 35, Federation of Hospital and University Employees ("Local 35"). The plaintiffs allege that Yale violated the terms of its collective bargaining agreement with Local 35 in violation of § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and that Local 35 violated its duty of fair representation implied by the National Labor Relations Act, 29 U.S.C. § 151 et seq. Thus, the plaintiffs bring a hybrid § 301/fair representation claim. Both defendants have moved for summary judgment on the plaintiffs' claim. For the reasons set forth below, their motions are being granted.

**I. FACTUAL BACKGROUND**

Yale employs the plaintiffs as furniture and equipment movers in the custodial services department at the Yale School of Medicine. Gamble has been employed by Yale since 1970, McCleod has been employed by Yale since 1985, Dickerson has been employed by Yale since 1984, and Nelson has been employed by Yale since 1983. At all times relevant to this action, the four plaintiffs worked as furniture and equipment movers at the Yale School of Medicine. All of the plaintiffs are members of Local 35. Local 35 is the exclusive collective bargaining representative for all of Yale's bargaining unit employees in the custodial services department. Yale and Local 35 have negotiated a series of collective bargaining agreements ("CBA's") setting out Yale's rights and obligations with respect to the employees in the bargaining unit. The specific labor grade and rate of pay for each job title are part of the CBA's negotiated between Yale and Local 35.

Prior to negotiations between Yale and Local 35 in 2003, the plaintiffs' position was classified at Labor Grade 8. During negotiations in 2003, the plaintiffs indicated that they wanted an increase in their labor grades. The union proposed upgrading the plaintiffs' position from Labor Grade 8 to 10. The union sought to achieve the upgrade without any other changes in the position or the requirements of the position. Yale indicated

that it would consider increasing the position to Labor Grade 10 if the employees acquired a commercial drivers license ("CDL") and submitted to drug testing.

Plaintiffs Nelson and Dickerson, both department stewards, were present for part of the negotiations. They stated that the plaintiffs wanted the increase in labor grade but without the CDL or drug testing requirements. Although the plaintiffs did not object to these requirements being applied to future employees, they did object to the requirements being applied to them. Excusing the plaintiffs from satisfying these requirements was referred to as "red circling" or "grandfathering" the plaintiffs.

Nelson and Dickerson left the negotiations after they were told by the union that they were no longer needed. They left with the understanding that their position would be increased to Labor Grade 10, that all new employees would be required to have a CDL license and undergo drug testing, and that the four plaintiffs would be excused from satisfying such requirements.

However, Yale was only willing to upgrade the plaintiffs' labor grade if the CDL and drug testing requirements applied to all employees holding the position. The union eventually agreed to these requirements because the pay increase could not be obained through the negotiations without them. The union believed that an agreement which provided employees with a choice of remaining at their current labor grade or receiving a pay

increase contingent on satisfying the additional requirements improved the position of its members.

Ultimately, Yale and Local 35 agreed to the following terms: (1) all new hires would be required to have a CDL and would be subject to drug testing; (2) the plaintiffs would not be required to acquire a CDL in order to keep their position; (3) if the plaintiffs decided to acquire a CDL, they would be given two years in order to obtain one and would be paid at the rate for Labor Grade 10 during those two years; (4) once the plaintiffs obtained their CDLs, they would also be eligible to receive a fifty-cent licensing premium; and (5) if any of the plaintiffs did not acquire a CDL within the two-year period, their position could be reduced back to Labor Grade 8.

On September 23, 2003, Yale and Local 35 entered into a Memorandum of Agreement (the "Agreement"). The Agreement provided, in relevant part:

> School of Medicine Custodial Furniture/Equipment Movers will be upgraded to LG 10 and paid at the incumbent rate ($19.08) and any other premiums to which they may be entitled. This increase will not have any effect on the furniture moving that is performed on the main campus under the LG7 Furniture Mover job title. The movers will be required to maintain Commercial Drivers Licenses and will be included in the pool of candidates subject to random drug testing. Incumbents not currently maintaining a CDL will be given two years to acquire a CDL, but will be candidates for drug testing effective on the signing of this agreement. When they are in possession of the CDL, they will be eligible to receive the 50-cent licensing premium.

(Affidavit of Santo Galatioto (Doc. No. 30), Ex. 1-L at ¶ 6).

Yale and Local 35 intended the Agreement to be understood as increasing the plaintiffs' position to Labor Grade 10 and requiring the plaintiffs to acquire CDLs within two years of the Agreement or risk a return to Labor Grade 8. The fifty-cent licensing premium was included to encourage the plaintiffs to acquire their CDLs as soon as possible.

Although Yale increased the plaintiffs' labor grade in accordance with the Agreement, the plaintiffs did not obtain CDLs. The union requested an extension of the two-year period and payment of some of the expenses related to obtaining the CDLs. The university agreed to the union's request.

On September 27, 2004, Kara Tavella ("Tavella"), Yale's Director of Facilities, sent a letter to each of the plaintiffs, informing them that Yale had agreed to the union's request for an extension of the two-year period for the plaintiffs to obtain CDLs. However, she explained:

> Please be advised that LG10 Custodial Furniture/Equipment Movers who have not taken the CDL drivers skill test by January 1, 2006 will be returned to a Labor Grade 8 position with corresponding pay. Individuals not passing the CDL drivers skill test will be grandfathered in LG10, without the licensing premium, until such time they successfully pass the test.

(Id., Ex. 3). Tavella also informed the plaintiffs that Yale would provide them with a truck for training and testing purposes and would reimburse the plaintiffs for reasonable training expenses. The plaintiffs acknowledge receipt of this letter.

In December 2004, Local 35 Vice President Mark Wilson ("Wilson") spoke to Dickerson, Nelson, and McCleod about the CDL requirement. The plaintiffs argued that the CDL requirement should not be applied to them. Wilson stated that the CDL requirement did apply to them, that the union agreed with the university on this point, and that each of them would be reduced to Labor Grade 8 if they did not acquire a CDL within the specified time period. Wilson told them that the union would not be able to do anything if Yale reduced them to Labor Grade 8 because such a reduction would not violate the contract.

The plaintiffs argued that (1) the union mistakenly or improperly agreed to the provision relating to the CDL requirement without their permission after they left the negotiation session, (2) the plaintiffs were grandfathered under the Agreement and therefore were not required to obtain a CDL within two years, and (3) the only detriment the plaintiffs would suffer if they did not acquire a CDL would be the loss of the fifty-cent licensing premium.

The plaintiffs discussed their position on the CDL requirement with the university and the union throughout 2004. Both the union and the university reiterated that, under the terms of the Agreement, the plaintiffs had to obtain a CDL in order to remain at Labor Grade 10. On April 11, 2005 and May 17, 2005, Yale sent letters to the plaintiffs reminding them that

their labor grade would be reduced if they did not obtain their CDLs by September 22, 2005.  On May 11, 2005, Nelson filed a grievance, claiming that the threatened downgrade was unfair and discriminatory.

On October 4, 2005, Yale wrote to the plaintiffs to notify them that the university would extend the deadline for the plaintiffs to obtain their CDLs to January 1, 2006.  In that letter, the university reminded the plaintiffs that they would suffer a reduction in labor grade if they did not obtain their CDLs by the new deadline.  The letter stated that Yale was still willing to lend the plaintiffs a truck for training and testing purposes, reimburse them for reasonable training expenses, provide assistance with practice work, and pay them for the time they needed to take the test during work hours.  On December 21, 2005, Yale wrote another letter reiterating these points.

When the plaintiffs did not obtain their CDLs by January 1, 2006, Yale reduced the plaintiffs to Labor Grade 8.  On January 12, 2006 and January 21, 2006, the plaintiffs filed grievances.  These grievances were combined with Nelson's May 11, 2005 grievance.

Pursuant to Article XV of the CBA, an employee's grievance must be presented within fifteen working days after it arises.  At the first step of the grievance process, the employee and his or her steward speak with the supervisor responsible for the

grievance. The supervisor must give an answer within three working days after the close of the discussion. If the grievance is not resolved, the employee may reduce it to writing within three days after receiving the oral answer of the supervisor. If the grievance is not resolved at that point, then the union may the appeal the grievance to the second step, and if necessary, to the third step. If the grievance is still not resolved after the appeal, either the union or the university may submit the grievance to arbitration.

In May 2006, Yale denied the plaintiffs' combined grievances, explaining that (1) they were untimely because the plaintiffs knew of the contractual provisions in September 2004 and did not file a grievance until May 2005 and (2) the university did not violate any provision of the CBA. On August 31, 2006, Yale again offered to assist the plaintiffs in obtaining their CDLs. The university suggested that each of the plaintiffs enroll a twelve-hour course paid for by the university, and if the plaintiffs were not successful in obtaining their CDLs, the university would pay for upgraded courses until the plaintiffs were successful. The university also offered to pay the plaintiffs for two weeks so that they could attend the course during work hours. Furthermore, the university offered to upgrade the plaintiffs to Labor Grade 10, retroactive to July 1, 2006, if they obtained their CDLs before

October 31, 2006.

On September 28, 2006, the Local 35 screening committee unanimously voted not to arbitrate the plaintiffs' grievances. On November 17, 2006, the union sent a letter to the plaintiffs explaining that it was obligated to honor the agreement that was negotiated with Yale in 2003. The union also offered to contact the university to explore whether it was still willing to provide assistance if the plaintiffs decided that they wanted to take the steps necessary to obtain the CDLs. On or about March 7, 2007, the plaintiffs filed this action, alleging that the union breached its duty of fair representation and that the university violated the CBA.

**II. LEGAL STANDARD**

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." See Celotex Corp., 477 U.S. at

322.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law."

-10-

Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See Celotex Corp., 477 U.S. at

324. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)(quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted. The question then becomes: is there sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party. See Anderson, 477 U.S. at 248, 251.

**III. DISCUSSION**

In order to establish a hybrid § 301/fair representation claim, "a plaintiff must prove both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-a-vis the union members. The plaintiff may sue the union or the employer, or both, but must allege violations on the part of both." White v. White Rose Food, a Div. of DiGiorgio Corp., 237 F.3d 174, 178-79

-12-

(2d Cir. 2001). The plaintiffs in this action have failed to create a genuine issue of material fact as to either of the elements of their claim.[1]

With respect to the first element, the plaintiff cannot establish that Yale breached the collective bargaining agreement with Local 35 by reducing the plaintiffs' labor grade after they failed to acquire CDLs. "When courts interpret CBAs, traditional rules of contract interpretation apply as long as they are consistent with federal labor policies." Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp., 230 F.3d 569, 576 (2d Cir. 2000). "In construing any contract, including a collective bargaining agreement, determining the intent of the parties is the essential inquiry." Local 1199, Drug, Hospital and Health Care Employees Union, RWDSU, AFL-CIO v. Brooks Drug Co., 956 F.2d 22, 25 (2d Cir. 1992) (internal citation and quotation marks omitted). When provisions of a collective bargaining agreement are ambiguous, courts "may look to such evidence as bargaining history, past practices, or other CBA provisions." Marcic v. Reinauer Transp. Companies, 397 F.3d 120, 131-32 (2d Cir. 2005).

In this case, the plaintiffs concede that both Yale and Local 35 intended that the Agreement be understood as requiring

---

[1] As defendant Yale correctly notes, section 301 of the LMRA preempts any state law claims by the plaintiffs because the plaintiffs allege a breach of a collective bargaining agreement. See Caterpillar Inc. v. Williams, 482 U.S. 386, 394 (1987) (discussing preemption of state law claims by § 301 of the LMRA).

-13-

the plaintiffs to acquire CDLs within two years or risk being returned to Labor Grade 8.  In 2004 and 2005, the university sent several letters informing the plaintiffs that, under the Agreement, they would be reduced to Labor Grade 8 if they did not obtain CDLs.  In December 2004, Local 35 informed the plaintiffs that the union agreed with the university's interpretation of the Agreement.  The plaintiffs contend that the Agreement only states that they would not receive the fifty-cent licensing premium if they did not obtain CDLs and does not explicitly provide for a reduction of labor grade if they did not obtain CDLs.  However, because the Agreement must be construed in order to effectuate the intent of the parties to the Agreement, the plaintiff cannot establish that Yale violated the Agreement by reducing the plaintiffs' labor grade after they failed to obtain CDLs.  See Masto v. Board of Educ. of Town of Hamden, 511 A.2d 344, 346 (Conn. 1986) (concluding that the plaintiff was not entitled to be recalled to his former position as an assistant principal after more than two years under the terms of the applicable CBA because the parties to the agreement asserted that they intended to place a one-year limitation on recall).

The plaintiffs also cannot establish that the union breached its duty of fair representation.  "[A] union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad

-14-

faith." Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 44 (1998) (internal citation omitted). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." Airline Pilots Ass'n Int'l v. O'Neill, 499 U.S. 65, 67 (1991) (citation and quotation marks omitted). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." Marquez, 525 U.S. at 45-46. "Bad faith requires a showing of fraudulent, deceitful, or dishonest action." Sim v. New York Mailers' Union No. 6, 166 F.3d 465, 472 (2d Cir. 1999).

None of the actions by the union alleged in the plaintiffs' complaint or asserted in their opposition to the motion for summary judgment constitute a breach of its duty of fair representation to the plaintiffs. First, the union did not breach its duty when it signed a contract that did not excuse the plaintiffs from the satisfying CDL requirement. The evidence shows that the union attempted to achieve an increase in the plaintiffs' labor grade without a CDL requirement but that the university would not agree to such an increase unless the plaintiffs obtained a CDL within two years. The union's conclusion that its members would benefit from a pay increase despite the additional requirement of obtaining a CDL was

-15-

reasonable.  Therefore, the union's decision to sign the CBA was not arbitrary or irrational.  Nor has the plaintiff produced any evidence of discriminatory conduct or bad faith on the part of the union in agreeing to the provisions contained in the CBA.  See Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953) ("Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees.  The mere existence of such differences does not make them invalid.  The complete satisfaction of all who are represented is hardly to be expected.  A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.").  In addition, the union continued to represent the plaintiffs' interests following the execution of the Agreement.  The union successfully negotiated two extensions of time for the plaintiffs to obtain their CDLs.  The university also agreed to provide the plaintiffs with a truck for training and testing purposes, reimburse them for reasonable training expenses, provide assistance with practice work, and pay them for the time they needed to take the test during work hours.  Under such circumstances, the union's actions during the course of its negotiations with Yale on behalf of the plaintiffs cannot be considered a breach of its duty of fair representation.

Second, the plaintiffs' argument that the union breached its duty of fair representation by concealing the contract language relating to the CDL requirement from the plaintiffs lacks merit. Although the plaintiffs believed that the CDL requirement would not apply to them at the time they were told to leave the negotiation session, there is no evidence that the union attempted to conceal the fact that the Agreement required the plaintiffs to obtain CDLs. In December 2004, the union informed the plaintiffs that they would suffer a reduction in labor grade if they failed to obtain CDLs within two years. The fact that the union did not personally notify the plaintiffs of the CDL requirement at an earlier point in time is of no consequence given the absence of evidence that the union acted in bad faith or that its conduct was arbitrary and discriminatory. See Walker v. Columbia University in City of New York, 756 F.Supp. 149, 153 (S.D.N.Y. 1991).

Third, the union did not breach its duty of fair representation when it refused to arbitrate the plaintiff's grievances. Although "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion," an employee does not have "an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement." Vaca v. Snipes, 386 U.S. 171, 191-92 (1967). In this case, the union concluded that

the plaintiffs' grievances lacked merit because both the union and the university understood the CBA as requiring the plaintiffs to obtain CDLs within two years in order to remain at Labor Grade 10.[2]  The union's decision not to arbitrate grievances that lacked merit cannot be considered arbitrary, discriminatory, or evidence of bad faith.  See id. at 191 ("If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined.").

Finally, contrary to the plaintiffs' assertions, the union did provide a rationale for its decision to not arbitrate the plaintiffs' grievances.  In December 2004, the union had informed the plaintiffs that it agreed with the university's interpretation of the Agreement.  In addition, following the union's vote, the union sent a letter to the plaintiffs explaining that it was obligated to honor the agreement it had negotiated with Yale.  It should have been obvious to the plaintiffs that the union declined to arbitrate their grievances because it did not believe Yale violated the CBA by reducing their labor grade when they did not obtain CDLs.  Therefore, the plaintiffs' contention that the union breached its duty of fair

---

[2]  The union also concluded that the plaintiffs' grievances were untimely because they were not filed within fifteen working days after they arose.  The plaintiffs were aware of the union's position that the CDL requirement applied to them in December 2004, but they did not file a grievance until May 11, 2005.

representation by refusing to provide its reasons for not pursuing the plaintiffs' grievances is without merit.

The plaintiffs' hybrid § 301/fair representation claim is also time-barred. "[A] six-month statute of limitations applies to hybrid § 301/fair representation claims." Carrion v. Enterprise Ass'n, Metal Trades Branch Local Union 638, 227 F.3d 29, 33 (2d Cir. 2000). This limitations period "begins to run when the employee knew or should have known of the breach of the duty of fair representation." Id. at 34 (quoting White v. White Rose Food, 128 F.3d 110, 114 (2d Cir. 1997)). In December 2004, the union informed the plaintiffs that it agreed with the university's interpretation of the CBA and that it would not be able to do anything if the university reduced their labor grade for failure to obtain CDLs. Thus, the plaintiffs' claim accrued no later than the end of 2004. Because the plaintiffs filed their complaint on March 6, 2007, their claim is barred by the statute of limitations. Moreover, a subsequent failure by the union to pursue the plaintiff's grievances, as the plaintiffs allege, cannot be treated as a continuing violation that precludes the running of the limitations period. See Buttry v. General Signal Corporation, 68 F.3d 1488, 1492 (2d Cir. 1995) (quoting Flanigan v. International Bhd. Of Teamsters, Truck Drivers Local 671, 943 F.2d 824, 827 (2d Cir. 1991)) ("Once a plaintiff learns of his union's breach of its duty of fair

representation, the union's subsequent failure to actually represent the plaintiffs 'cannot be treated as a continuing violation that preclude[s] the running of the limitations period.'")

**IV. CONCLUSION**

For the reasons set forth above, Defendant Yale University's Motion for Summary Judgment (Doc. No. 28) and Defendant Local 35's Motion For Summary Judgment (Doc. No. 32) are hereby GRANTED.

The Clerk shall enter judgment in favor of the defendants and close this case.

It is so ordered.

Dated this 9th day of July 2008 at Hartford, Connecticut.

/s/ AWT
Alvin W. Thompson
United States District Judge
